STATE OF IOWA, Appellee, v. FLOYD DAVIS, Appellant.

No. 40344.

February 10, 1931.

Rehearing Denied May 6, 1931.

O. M. Slaymaker and R. E. Killmar, for appellant.

John Fletcher and E. K. Jones, for appellee.

Evans, J.—The crime charged, if such, originated on the night of July 24, 1929. On that night a cow was stolen from a farm near Winterset in Madison County, and conveyed by truck to the farm of the defendant in Clarke County near Osceola. The cow was kept in apparent concealment on the defendant's farm until the morning of July 26, at which time she was placed by the defendant in a neighbor's pasture a mile away. This act on the part of the defendant was stimulated by the fact that the prosecuting officials of Clarke County were already on the trail of the larceny and had been on such trail since the morning of July 25. Under the evidence for the State five persons were involved directly or indirectly in the larceny. The defendant himself was a farm renter in Clarke County a

few miles distant from Osceola. On and before July 24, 1929, he was engaged with his teams in highway construction under employment by contractors. In the late afternoon of that day a group of four persons came into the town of Osceola and sought his temporary aid and service. These were, John A. Davis, and Ethel Gray Davis, his wife, and Albert Gray, his father-in-law, and Earl Anderson. The automobile in which they had come had become disabled and was awaiting repairs. They represented to the defendant that they had a truck which they had left at the home of one Harry Gray, two miles distant from the town of Lorimor. They requested that he take them to such destination for the purpose of getting their truck, and this request was complied with by the defendant. They all rode together in the defendant's automobile to the home of Harry Gray (in no manner connected with, or related to, Albert Gray). They there obtained the truck leaving the home of Harry Gray at about nine o'clock. This truck carried a tight box about 4½ feet high and was equipped with a device which could be conveniently used as a loading chute for stock. The party went out into the night on a foraging expedition and in the direction of Winterset in Madison County, which adjoins the county of Clarke on the north. The truck was occupied by Albert Gray and Earl Anderson, and was preceded in the drive by the other three parties in the defendant's automobile. One stop was made at one farm and a barn was visited by some of the men, who later retreated therefrom with some haste and after some discovery. Proceeding further in the general direction of Winterset, some cattle were observed in a pasture. From this pasture the cow in question was taken and loaded into the truck, with the aid of the loading device therein contained. It was then arranged that the cow should be taken to the home of the defendant by Gray and Anderson. A note to his wife was written by the defendant, and put in the hands of Gray and Anderson, which note directed the wife to have the cow placed in the "northwest stall" in the barn and to give the men a breakfast. The named men delivered the cow according to these directions and the wife prepared the breakfast at two o'clock A.M. From the scene of the larceny the other three members of the party returned to Osceola in the defendant's car. The four members of the party other than the defendant were arrested on the

following day, July 25. At a later time prosecution of the defendant was instituted. The other members of the party were first tried and convicted, the trial of the defendant being the last in the series. J. A. Davis is not related to the defendant, Floyd Davis, but they had been acquainted for several years. Where J. A. Davis and wife and father-in-law came from, or where they reside, or what other purpose, if any, brought them to the town of Osceola, is not disclosed in the record. Their truck carried a Minnesota license and this is the only suggestion whatever of their place of abode. Earl Anderson joined the Minnesota trio at Stratford, near Boone, a few days before July 24. He is referred to in the testimony of the defendant as the "cross-eyed boy". He was convicted upon a plea of guilty and paroled. He was thereupon used by the State as a witness. His testimony carries the infirmity of self-stultification and the qualified disability of an accomplice, as a witness. His testimony furnished the details of the larceny. The fact that the cow was stolen, however, is accepted by the defense as a verity. No argument is directed to the contrary. The testimony of Anderson is abundantly corroborated so far as the requirements of the statute are concerned. The defendant became a witness in his own behalf. His explanation of his connection with these parties, is substantially and briefly indicated in a written statement made by him to the public officials on July 26, 1925, as follows:

"I, Floyd Davis, state that on Wed evening July 24th, 1929, J. A. Davis, a woman whom he said was his wife, an old man by the name of Gray and a small cross-eyed fellow were taken by me in my automobile to Harry Grays west of Lorimor Iowa; that there they had a truck and it was my purpose in taking them there so they could get the truck as they told me that their automobile was in the garage for repair; all four of them and myself rode in my automobile to the Gray place west of Lorimor. That on the road to Lorimor they all talked to me about having a cow that they wanted to sell to me; old man Gray said that the cow was over to his place, he indicating to me that he lived near Winterset, Iowa; they told me that they had taken this cow in on a trade; I mentioned to them that the cow might be a stolen cow and they stated that they had taken her in on a trade; that I did not see the cow at Harry Gray's; they asked me seventy-five dollars for the cow; they told me,

that is, John Davis and old man Gray told me that the cow would weigh about one thousand pounds; I told them that if the cow was as described by them that I would take the cow and pay them Saturday, July 27th, when I got my check from the road work; they, old man Gray and John Davis told me that they would sell her that way and that they would bring her to my place that night; that John Davis, his wife and myself left the Harry Gray farm that night ahead of old man Gray and the cross-eyed boy who was with the truck; that I do not know which way the truck went from the Gray place; that John Davis, his wife and myself came back to Osceola, and I did not see the old man and the cross-eyed boy any more that night; the next morning when I came home I saw the cow the first time, and she was in the barn where I had told them to put her; the cow remained in the barn until yesterday evening when I came back from Osceola; that I became suspicious about the cow and to get her off of the premises I drove her down the road west and into Clell Bell's pasture. I put a wire yoke, made out of barb wire on her, so that she could not get out of the pasture and to prevent her from coming back to my place as I did not want the cow to come back to my place; that this cow was a red cow with one short stubby horn and is the cow that I went to the Bell pasture with J. H. Lewis and pointed out to him as the cow which was brought to my place as heretofore referred to; that I have known John Davis for a number of years; that none of the parties informed me as to where they got this cow that was brought to my place.''

The foregoing is a sufficient indication of the general character of the evidence to enable an understanding of the assignments of error and the grounds thereof.

I. The first assignment of error laid by the appellant is directed to the proposition that the evidence of Anderson shows the defendant to have been guilty of the larceny and being guilty of the larceny he could not be convicted of the crime of concealing or aiding the concealment of the property which he himself stole.

The offense charged against the defendant is defined by Section 13042. This statute sets forth three forms of offense: (1) buying stolen property; (2) receiving stolen property; (3) concealing stolen property; all with knowledge that it was stolen.

These defined offenses bear a strong analogy to the nature of an *accessory* to an offense under common law. At common law it was requisite that an *accessory* be prosecuted as such and not as a *principal.* It was also requisite in the trial of an accessory that proof of the prior conviction of the principal be made. Under modern statutes, and under our own, the distinction of method of prosecution as between a principal and an accessory, has been abolished. The modern requisite is that an accessory must be prosecuted as a principal and not otherwise; and he may be so prosecuted without waiting for the conviction of the principal. Section 13042 proceeds along the same line of progress in criminal procedure. It defines as separable offenses certain wrongful acts which usually follow the principal offense and which at common law would render the perpetrator an accessory after the fact. Under Section 12895, Code, 1927, it is provided that an accessory *before* the fact must be indicted, tried, and punished as a principal. Under Section 13042 it is in effect provided that the accessory *after* the fact shall be indicted, tried, and punished as principal in the commission, not of the original preceding offense, but of the particular subsequent offense committed by himself as defined in such section. It is true, as contended by the appellant, that a few courts have so administered statutes similar to our Section 13042 as to preserve some distinction between principal and accessory; and have held that a defendant may not be prosecuted for the *after*-offense if in fact he be guilty of the original offense. This position is fortified to some extent by the argument that the thief can not be guilty of *buying stolen property from himself* or of receiving stolen property from himself. No case is cited to us wherein it has been held that the thief may not be guilty of *concealing* property as an independent act after the larceny by himself. This argument is met in some cases by holding that it has no application to a case where two or more persons are connected with the original larceny and that it can apply only to those cases where the larceny was committed by one person alone and where the after offense of buying, receiving, or concealing, is charged against the same person. We had the question before us in State v. Boyd, 195 Iowa 1091, wherein the defendant was charged with *receiving* stolen property. In our discussion of the question in that case we said: (pages 1096-7)

"Under the common law, a person who aided and abetted in the commission of a public offense was guilty as an accessory. The common law recognized an accessory before the fact and an accessory after the fact, and, under the common law, an accessory was indicted and tried as an accessory, and could not be indicted and tried as a principal. This was true of all crimes, —not only of larceny, but of murder, arson, and crimes generally. The legislature, in adopting Code Section 5299, intended to and did abrogate the distinction that had existed at common law between an accessory before the fact and a principal, and provided that all persons concerned in the commission of a public offense, whether they directly commit the act or aid and abet in its commission, must be indicted, tried, and punished as principals, and not as accessories. This changed the method of procedure in regard to accessories in all crimes. Then the legislature, as an entirely separate and distinct statute, provided for the establishment of a new and distinct statutory crime,— one not known or recognized at common law, to wit, the offense of receiving stolen property. This statutory crime is the crime for which appellant was indicted in this case. Whether or not a party who may be indicted for this distinct offense of receiving stolen property might also be indicted as a principal for some other offense, as burglary or larceny, to which he might have been an accessory under the common law, is a question which we do not have before us in this case, and upon which we are not required to express an opinion. What we do hold at this point is that defendant was specifically charged by indictment with the distinct and separate statutory offense of receiving stolen property. It is no defense to that action for him to claim that he might have been indicted as principal in some other offense, either burglary or larceny. He is now charged with this distinctive, statutory crime of receiving stolen property. Whether or not a conviction of such an offense would be a bar to a conviction of the offense of either burglary or larceny is not involved in this appeal, and upon it we express no opinion. We are limiting our decision to the single proposition that the legislature has created a distinct and separate statutory offense, known as the crime of receiving stolen property. It is for this offense, and it alone, that the defendant has been indicted in this case. The sole question to be determined

is whether or not he is guilty of such an offense. If he is, it is no defense to this action to claim that he might be charged as principal in some other offense, as burglary or larceny.''

Reliance is placed by the appellant upon our holding in State. v. Butler, (Iowa) 205 N. W. 842 (not officially reported). In that case the defendant was charged with the offense of *receiving* stolen property. The only evidence introduced in support of the charge in that case was that the defendant himself stole the property. It was held that the evidence was insufficient. Special reliance is placed by the appellant upon this statement made therein: ''It is elementary that if he *alone* was guilty of larceny, he could not be guilty of receiving stolen property.'' The foregoing can be of no avail to the defendant herein. Under the evidence for the State the defendant was present at the larceny. Under his own evidence he denies his presence but avers that he bought the cow from Davis and Gray. Under the defendant's own evidence he puts himself in the role of a purchaser, if innocent, and in the role of an accessory, if not innocent. It will be noted that we have not heretofore passed definitely upon the particular question here under consideration. As to what may be the sounder rule to be adopted in such a case, there is more to be said for the contention of the State and less for that of the defendant. The defendant has not been convicted of the antecedent offense of larceny. Whether he could be further prosecuted for this offense if he had been so convicted by the State, is not before us; nor do we imply that two prosecutions might be had. Under the statute the larceny under the circumstances shown would be punishable with a maximum of 10 years' imprisonment; whereas the offense under which the defendant is prosecuted calls for a maximum of five years. If the State elects to prosecute for the lesser offense rather than the larger, this ought not to be deemed prejudicial to the defendant. The State was confronted with uncertainty if it prosecuted the defendant for the larceny. Granted that the evidence introduced by the State would have sustained a verdict of guilty by the jury, it was yet true that it might not be sufficient to convince the jury. All the instrumentalities in the commission of the larceny were owned and controlled by the other group. A jury might believe that he was guilty of buying, receiving, or concealing the property and yet doubt his responsibility for

590

the original offense. In other words the State might fail in a prosecution for larceny and yet win in a prosecution for concealing the stolen property. The identity of the perpetrator of the larceny was not in issue. The State was called upon to *prove* that the property was stolen. But the identity of the particular perpetrator was not essential in the present case. The defendant became a witness in his own behalf and denied vigorously his connection with the larceny. Why then should he be entitled in a motion for a directed verdict to plead his commission of the larceny as a defense against the charge of concealment?

When it is further considered that the concealment of the stolen cow occurred in Clarke County, whereas the larceny and the asportation occurred in Madison County, the reason for the statutory modification of the common law rule stands out more clearly. The only offense committed by the defendant in Clarke County was the concealment. The larceny was an offense complete in Madison County. In any event it must be said that our holding in State v. Boyd, 195 Iowa 1091, requires a similar holding herein. Nor do we purport here to consider the application of the rule to a case where the defendant at bar was the lone and only perpetrator of the original larceny. In such a case the natural law of logic in the assertion of its sway is not to be ignored in the construction of the statute. We now only hold upon this record that the presence of the defendant at the perpetration of the larceny in Madison County did not operate as a bar against his prosecution for the concealment of the stolen property in Clarke County.

II. The defendant assigns error upon the admission of testimony relating to an incident or interview between the defendant and two witnesses, Holtom and Parmenter, and testified to by said witnesses and by Earl Anderson. According to such testimony it appears that on the evening of July 24, 1929, and just before the group started upon their trip to obtain the truck left at the home of Harry Gray, the defendant and John Davis and Earl Anderson drove together in the automobile of the defendant to the stockyards to see Holtom, who was a hog buyer. The defendant advised Holtom that he had hogs to sell; that he could not bring them in in the daytime because he was engaged upon his highway work; that he would therefore have

to bring them in at night or very early in the morning. Parmenter was an employee of Holtom's, and a part of the conversation was had with him. He was advised that he could bring them in at any time of night or day. Later testimony showed that he had no hogs ready for the market and that none were brought in. The defendant himself testified on cross examination that he made the inquiry on behalf of John Davis and not on his own behalf and that he so stated at the time. The complaint of the defendant is that all this testimony was inadmissible in that it tended, and was intended, to show the commission of another crime. Such objection is not necessarily tenable. Where guilty knowledge or intent is a material issue in the prosecution, proof of other similar offenses is admissible within certain recognized limitations. This is especially so where such other offense is closely connected in time and circumstance to the offense under prosecution. This interview did not tend to show another offense committed, though it did tend to show present intention to commit a like crime.

Moreover it appears in the record that the defendant immediately after taking possession of the cow in question made certain explanatory statements to the public officials and signed a written statement. That written statement was in material respects inconsistent with, and contradictory to, the circumstances of the interview. The evidence would have been admissible on that ground alone.

In his written statement, and likewise in his evidence, the defendant testified that from the time he met John Davis and his group about 5:00 P.M. July 24, he was in the presence and company of John Davis and his wife continually except for a period of five minutes, until early in the morning of July 25. So far his statements are in accord with the contentions of the State. He recited certain conversations had between him and John Davis and Albert Gray and purported to account for his whereabouts throughout the night. According to his story they left Osceola in the evening between six and seven o'clock for Lorimor and took supper together at Lorimor about twenty-five miles distant. They went from Lorimor to the home of Harry Gray two or three miles west, where they obtained the truck. He stated that on the way to Lorimor John Davis and Albert Gray told him that they had a red cow which they wanted

to sell him. He testified: "I told them if the cow was as described by them that I would take the cow and pay them Saturday; old man Gray and John Davis told me that they would sell her that way and that they would bring her to my place that night." Again: "They told me that they had taken this cow in on a trade; I mentioned to them that the cow might be a stolen cow, and they stated that they had taken her in on a trade." He testified also that they told him the cow was a pale red about six years old and weighed one thousand pounds. All this information was imparted to him on the road before they got to Lorimor. This followed immediately after the interview at the stockyards. At this point of time the cow had not been stolen. The interview at the stockyards indicated that the group intended to devote that night to the bringing into the stockyards of a truck load of hogs. While it is contended that the Minnesota group had a cow they wished to trade, no intent was indicated at the stockyards interview to bring in or to offer that cow for sale or trade. He also testified in chief: "They told me they had two truck loads of stock hogs to deliver to a man and they would bring this cow *after they got the hogs delivered.*" Though Holtom and Parmenter testified that the defendant said to them that he had the hogs for sale, he himself testified that he said that John Davis had them for sale. Neither of them had any hogs at that time. If either of them intended to deliver any hogs that night, such hogs were yet to be acquired. The defendant knew that he had none that he could bring whatever he may have said on the subject to Holtom or Parmenter. He had known Davis for many years. He had also known Albert Gray previously. They were non-resident and operating under a Minnesota license. They were away from home. Could a jury find that the defendant could not reasonably have believed that John Davis or Albert Gray had any hogs of their own in the near vicinity of Osceola? If, under the evidence, he had good reason to know that they had no hogs of their own available for marketing at Osceola that night and that they were nevertheless intending to market hogs there, could he ignore such knowledge when he later received from them the same night the stolen cow? Suppose in fact they had stolen hogs, and had brought them to the stockyards in accord with their proposals; and had thereafter on the same night stolen the cow and de-

livered her to this defendant, would the evidence of the interview be admissible? To our minds it would be clearly so. Our cases on this subject are very numerous. See State v. Baugh, 200 Iowa 1225, and the many other cases cited therein. The same principle would apply as in a case where this defendant knew that his companions were engaged methodically in the enterprise of larceny. We think the interview in question in connection with what transpired during the following night, including the fact that the defendant was with them all the night, was evidence tending to show his guilty knowledge that all the property acquired by these persons during that night was stolen property, be it hog or cow. We hold that the objection to this evidence was not sustainable.

 It further appears that the State cross-examined the defendant while on the witness stand on this subject. Objection is urged at this point that such examination was improper cross examination because the defendant's own counsel had not interrogated him thereon. The result of the cross examination was an explanation by defendant of what he had done and said to the effect which we have already stated. It is true that the defendant was not interrogated on this subject in his examination in chief. He did purport, however, to account for all his doings from the time he met the Minnesota group until the early morning of the next day. As already indicated, he testified that he was in the continued presence and companionship of John Davis during that whole night. It was during that very period of companionship that the cow was stolen. In his account of himself he had covered the entire period of time from his first contact with John Davis to, and beyond, the point of time at which the larceny occurred. Having opened up the ground in his examination in chief, we can conceive of no reason why the State should not be permitted to enter upon the same ground and to pursue its further details.

The defendant complains of prejudice because of the sinister aspect cast upon this interview by an event that occurred later in the night and which has already been referred to. Anderson testified that the group first stopped near a barn which was visited by some of the men and from which they hastily returned with an explanation that someone was living there. The whole group thereupon hastened away to another part of

the county. It was after this event that the cow was stolen. In the light of this evidence undoubtedly the interview at the stockyards took on a grave significance. But the later evidence was nevertheless admissible as a tracing of this defendant through the night. He testified as to the details of the night, as he claimed them to be. Anderson testified that he was at this barn and that he was one of those who visited it and ran away from it. The fact that such evidence was prejudicial was not an objection to it. If the evidence had shown that the expedition was successful and that hogs were stolen and carried away from there, it would be still more prejudicial. But no one could claim that this would be a reason for its exclusion. Sufficient to say in any event that the court carefully instructed the jury that none of this evidence could be considered for any other purpose than on the question of the guilty knowledge of the defendant. This was all the protection to which he was entitled as against such evidence.

III. Complaint is next directed against a ruling of the court which excluded certain evidence offered by the defendant as impeachment of the State's witness Anderson. It appears that John Davis, Ethel Davis, Albert Gray, and Earl Anderson were all arrested on the morning of July 25, and that a county attorney's information was laid against each of them. Earl Anderson had already made an oral confession. In support of the information against him, minutes of testimony against him were attached by the county attorney. The witness named was the sheriff Lewis to whom Anderson had made the oral confession. It was related in the minutes thus attached to the information that the sheriff Lewis would testify to certain oral admissions and confessions made by said Anderson and these admissions and confessions were recited in such minutes. The recital of admissions thus set forth included the statement that each and all of the four defendants then under arrest were present at the commission of the larceny. The recital did not contain the name of Floyd Davis, who was not then under arrest.

Attached to the information against John Davis, were minutes of the testimony in support of such information. Earl Anderson was named in such minutes as the witness and the substance of his testimony was set forth therein by the county attorney in substantially the same form as it appeared in the

proposed testimony of Sheriff Lewis, attached to the information against Anderson himself.

On cross examination of the witness Anderson and for the purpose of laying grounds for impeachment, counsel for the defendant presented to him these minutes of testimony and asked him to state whether the recitals therein were true. He testified that they were true. In the same cross examination he testified that in his confession he named Floyd Davis as well as the other defendants, though Floyd Davis was not at that time under arrest.

On rebuttal, and for the purpose of the impeachment of Anderson, the defendant offered in evidence the ''minutes'' of evidence already referred to as being attached to the informations against Anderson and John Davis respectively. Upon objection by the State the court excluded it. The purpose of their offer was to show that the name of Floyd Davis was not contained in such minutes. The ruling was clearly proper. The omission of the name of Floyd Davis from such minutes had no significance whatever, as showing any inconsistency between the evidence of Anderson at the trial and his previous statements to the county attorney and to sheriff Lewis. The writings offered in evidence were not of his making. They were not signed by him. What he *said* in his oral admission was the material question. It is undisputed that he did name Floyd Davis with the rest. The fact that the prosecuting attorney had no need or use under those prosecutions for the name of Floyd Davis, or the fact, if such, that he wished to avoid any implication against Floyd Davis until after further investigation, could not be available to the defendant as an impeachment of Anderson. Nor was there any impropriety in such omission on the part of the county attorney. The written statement was literally in accord with the testimony of Anderson as far as it went. It was incomplete only in the sense that the county attorney withheld from his recital the name of this defendant. Such withholding had no significance whatever for impeachment purposes.

■ IV. Lastly, earnest complaint is made over the admission of the testimony of Anderson concerning the stop made by the group at the barn, which we have hereinbefore referred to. It is stated in argument that this evidence was all objected to as incompetent, immaterial, and irrelevant and that such ob-

jections should have been sustained. It is also urged that its admission was highly prejudicial.

In the record before us, this evidence is all set forth in appellant's abstract in narrative form without objection thereto at any stage thereof. This fact precludes our present consideration of the complaints now directed thereto by the defendant. Upon the whole record the evidence of guilt is very persuasive. The errors assigned are not well taken.

The judgment below must accordingly be affirmed.

FAVILLE, C. J., and MORLING, KINDIG, and GRIMM, JJ., concur.